## STATE OF NORTH CAROLINA v. FRANK JOSEPH RINALDI.

### (Filed 18 June, 1965.)

**1. Homicide § 20—**

Evidence of prior bickering between defendant and his wife, of defendant's financial difficulties, his procurement of insurance on the life of his wife, his attempt to hire a person to kill his wife, and, on the morning she was killed, his statement to the person he had attempted to hire that he had killed his wife himself, and that she was found in their apartment dead from strangulation, etc., *held* sufficient to overrule nonsuit in a prosecution for homicide, notwithstanding defendant's evidence of alibi.

**2. Criminal Law § 98—**

Evidence permitting conflicting conclusions in regard to the fact in issue must be submitted to the jury, it being the function of the jury to evaluate the evidence and determine the truth or falsity of the testimony.

**3. Criminal Law § 34—**

In a prosecution of a husband for the murder of his wife, evidence tending to show that prior to the homicide he had made improper sexual advances toward the male witness does not, standing alone, tend to establish defendant's guilt of his wife's murder, and the admission over his objection of the evidence tending to show that he was a sexual pervert, emphasized in the solicitor's argument to the jury, is prejudicial error.

PARKER, J., dissenting.

SHARP, J., Concurs in dissent.

APPEAL by defendant from *Mallard, J.,* November 1964 Special Criminal Session of ORANGE.

Defendant was charged and convicted of the willful and premeditated murder of his wife, Lucille Begg Rinaldi (Deceased), on December 24, 1963. The jury recommended life imprisonment. Judgment imposing punishment, as recommended, was entered. Defendant excepted and appealed.

STATE *v.* RINALDI.

*Attorney General Bruton; Deputy Attorney General McGalliard for the State.*

*Cooper & Winston; Bryant, Lipton, Bryant & Battle for defendant appellant.*

RODMAN, J. Defendant makes two basic contentions: (1) The evidence is not sufficient to establish that he was in any way responsible for his wife's death; and (2) he is, in any event, because of prejudicial error occurring during the trial, entitled to have another jury pass on his guilt or innocence.

The evidence is sufficient for a jury to find these facts: Defendant and Deceased were raised in Waterbury, Connecticut. Their acquaintance dated from high school days. Defendant took her to the Senior Prom.

Defendant, a graduate student in English at Chapel Hill, was, in 1963, 33 years of age; Deceased was about the same age. They became engaged some time during the spring of 1963. Deceased was then living with her family in Waterbury. She was teaching school. Defendant needed money to pay his expenses while at Chapel Hill. Deceased, on at least three occasions, sent defendant checks for $200 or more, money that she had saved from her salary. They were married in Waterbury, Connecticut, the latter part of July 1963.

On July 3, 1963, applications were made to Prudential Life Insurance Company for insurance on their respective lives. The policy insuring the life of Deceased called for a payment of $20,000 on proof of death, with provision for an additional $20,000 in the event of accidental death. Defendant, designated as "fiance," was named as beneficiary. At the same time, defendant applied for and obtained a policy for $10,000 on his life. This policy also provided for double indemnity in the event of accidental death. Deceased was named as beneficiary in that policy.

In the spring of 1963, Deceased had sought and obtained a contract to teach in the public schools in Chapel Hill for the ensuing school year. School opened on September 9. Deceased came to Chapel Hill a few days before school opened. She attended school conferences on two days prior to the opening of school, but was not present when school opened. She returned to her family in Waterbury. On September 16, she wrote school officials offering her resignation, explaining it was necessary because of extreme personal family trouble.

In October 1963, defendant applied for a loan of $2,300 from the University Loan Fund for Students. The loan was approved on October 22. He was advanced $400 on his loan early in November. On December 24, he owed the University this $400. In his application for

the loan, he included among his obligations the sum of $720 for annual life insurance premiums.

On November 1, 1963, defendant obtained a loan of $752.24 from Carolina Bank & Trust Company. The amount owing on that loan was, on December 24, 1963, $720.24.

Not long after the marriage, defendant made inquiries with respect to his right to share in property which he expected his wife to inherit.

Defendant occupied a two bedroom apartment at 105 North Street in Chapel Hill. He and his wife occupied this apartment when she was in Chapel Hill in September. Defendant continued to occupy the apartment after his wife returned to Waterbury. In the summer of 1963, defendant employed Alfred Foushee to do a "general house cleaning job" at the apartment. Not long afterward, defendant got Foushee to go to the apartment on the pretext that another house cleaning was needed. Defendant then sought to hire Foushee to kill his wife, stating he wanted it done in such a way as to make it appear accidental. Foushee declined. Defendant, on subsequent occasions, sought to get Foushee to kill his wife, or, if he would not do it personally, to locate someone who would do it. He offered to pay Foushee $500 if he would locate someone who would murder his wife. Foushee continued to rebuff defendant.

Deceased returned to Chapel Hill on December 21. About 1:45 p.m. on December 24, the police, in response to a telephone call, went to defendant's apartment where they found defendant and John Sipp. The living room was in disarray. Deceased's body was lying face down on the floor. She was clad in pajamas and a housecoat. Her face was bloody; a scarf was knotted around her neck, covering her mouth. Her pocketbook was lying open on the floor; part of the contents were scattered on the rumpled rug. The body was immediately in front of a sofa, on which was a pillow showing blood stains.

In the apartment when the police arrived were defendant and John Sipp. They informed police they had spent the morning in Durham shopping. When they returned from Durham, they stopped at the Post Office a moment, then went to a store, and from there to the apartment. Sipp, at defendant's request, promptly called the police and a priest.

Both Sipp and defendant told the police Sipp had, shortly before 9 a.m., stopped at the apartment to pick up defendant for a trip to Durham, pursuant to arrangements made the preceding night. They had been together from the time defendant left the apartment until they returned shortly before 2:00 p.m.

Foushee testified to seeing defendant in the business section of Chapel Hill about noon, at which time defendant said to Foushee: "It is over, I did it."

An autopsy was performed on the night of December 24. Work began about 8:40 and was completed about 1:00 a.m. Christmas morning. Rigor mortis and livor mortis were estimated at 2 or 3 plus, where 4 plus is maximum. There were lacerations above the eyes; the tissues about both eyes were swollen, a dark blue. A pathologist expressed the opinion that the visible injuries to the head were caused by blows by some blunt instrument. The blows, in his opinion, were not sufficient to cause death, but would have rendered Deceased unconscious. In his opinion, death was caused by "asphyxia or suffocation. That suffocation could have been caused by a scarf tied tightly around her nose and mouth. That asphyxia could have been caused by a pillow being pressed against her face. * * * Based on the autopsy findings, death could have occurred any time between 10:00 A.M. and 5:00 P.M. on December 24, 1963." He further testified: "I do have an opinion satisfactory to myself as to the maximum time which could have elapsed between the blow the decedent received on the back of her head and her death. It is approximately one hour. More likely 30 minutes, certainly no more than one hour. There was not any evidence of skull fracture."

The foregoing is a summary of the evidence tending to support the State's contention that defendant, having meditated the question, wilfully and deliberately killed his wife. The evidence, with the inferences which may be drawn therefrom, if true, is sufficient to support a verdict of guilty of the charge contained in the bill of indictment. Whether entirely true or entirely false, or true in part and false in part, presented questions of fact to be determined by the jury. The truth or the falsity of the evidence was not for the court. The motion to nonsuit was properly overruled.

Defendant offered evidence from which the jury could find that he was not in the vicinity of the apartment between 8:45 a.m., when he and Sipp went to Durham, and 1:40 p.m., when he and Sipp returned to the apartment and found Mrs. Rinaldi dead. The principal witness for the defense was Sipp, who testified at length in support of defendant's claimed alibi. The other witnesses for the defendant corroborated Sipp's testimony, or testified to Sipp's good character. Defendant did not take the stand, nor did he offer evidence as to his character.

Foushee, after testifying as to defendant's effort on the second visit to the apartment to bribe him to kill Mrs. Rinaldi, and his refusal, testified: "Mr. Rinaldi called me a little while after that and told me to come over to where he was sitting at the time. He was sitting on a couch. I was sitting in a chair directly in front of him. * * * Mr.

Rinaldi asked me to come over and when I got over there he reached for my privates, my pants there, and he put his hands there; I pushed them down. * * * He told me to unzip my pants; I wouldn't do it; I pushed him off again, so he said, 'Take it out, and let me see it.' * * * I didn't take it out, so he reached in his pocket and got some money out and handed it to me; I still rejected him, and after I kept rejecting him trying, he then told me he was sorry, he hated he had tried to do anything like that, he was ashamed of himself. After that I left."

Defendant objected to the testimony quoted above. The objections were overruled. The solicitor, in his argument to the jury, made use of the testimony to evaluate defendant's character, a character that would not hesitate to murder. Evidence tending to show that defendant is a sexual pervert does not, standing alone, tend to establish the fact that he is also a murderer. To make such evidence competent, the State would have to show some direct connection between defendant's abnormal propensities and the charge of homicide for which he is then on trial.

The jury should not be prejudiced to defendant's detriment by evidence tending to prove that he is a moral degenerate, prepared to commit the abominable and detestable crime against nature, a felony.

This Court has repeatedly held such evidence incompetent, requiring a new trial. A full statement of the rule, the reasons for the rule, and the limitations on the rule are stated clearly and concisely in the able opinion of Ervin, J. in *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364. He supports his conclusions with copious citations. See also *State v. Gammons,* 258 N.C. 522, 128 S.E. 2d 860; *State v. Stone,* 240 N.C. 606, 83 S.E. 2d 543; *State v. Brady,* 238 N.C. 404, 78 S.E. 2d 126; *State v. Needham,* 235 N.C. 555, 71 S.E. 2d 29; *State v. Fowler,* 230 N.C. 470, 53 S.E. 2d 853; *State v. Page,* 215 N.C. 333, 1 S.E. 2d 887; *State v. Castle,* 133 N.C. 769, 46 S.E. 1; Stansbury's N. C. Evidence, §§ 80 and 104.

The evidence was both prejudicial and incompetent.

In view of our conclusion that defendant is entitled to a new trial because of the admission of incompetent evidence, it is neither necessary nor advisable to discuss defendant's other assignments of error. The asserted errors may not arise in the next trial.

New trial.

PARKER, J., dissenting. The majority opinion holds that defendant is entitled to a new trial by reason of the admission in evidence over his objections and exceptions of testimony of the State's witness Foushee tending to show that defendant was a sex deviate — the testimony is set forth in the majority opinion and is not repeated here. The ma-

jority opinion holds that such evidence was incompetent, prejudicial to defendant, and entitles him to a new trial. The reason assigned is the general rule that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense. *S. v. McClain*, 240 N.C. 171, 81 S.E. 2d 364.

In *S. v. McClain, supra*, this is stated: "The general rule excluding evidence of the commission of other offenses by the accused is subject to certain well recognized exceptions, which are said to be founded on as sound reasons as the rule itself. 22 C.J.S., Criminal Law, section 683. The exceptions are stated in the numbered paragraphs, which immediately follow." Ervin, J., the writer of the opinion in this case, with his usual clarity and correctness, sets forth eight exceptions, most of which exceptions are supported by superplenary authority. In my opinion, taking into consideration the entire conversation between defendant and Foushee, all the evidence in respect to the relationship between defendant and Foushee, and all the attendant circumstances, this evidence is competent under Judge Ervin's paragraphs 1, 2, 3, and 5. I vote to affirm the judgment below.

